**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

THOMAS F. KUZMA,
*Defendant-Appellant.*

No. 18-10042

D.C. No.
4:17-cr-00855-
RM-JR-2

OPINION

Appeal from the United States District Court
for the District of Arizona
Rosemary Márquez, District Judge, Presiding

Argued and Submitted October 4, 2019
San Francisco, California

Filed August 3, 2020

Before: Richard A. Paez and Daniel P. Collins, Circuit
Judges, and Jennifer Choe-Groves,* Judge.

Opinion by Judge Collins

---

* The Honorable Jennifer Choe-Groves, Judge for the United States
Court of International Trade, sitting by designation.

# SUMMARY**

---

### Criminal Law

The panel affirmed in part the district court's judgment in a case in which the defendant was convicted of possession of a machinegun (18 U.S.C. § 922(*o*)) and possession of an unregistered machinegun (26 U.S.C. § 5861(d)); and remanded with instructions to vacate one of the two convictions.

The panel rejected the defendant's contention that the statutory definition of "machinegun" underlying both counts is unconstitutionally vague. Considering the proper construction of the challenged statutory phrase, the panel concluded that a weapon is "designed to shoot . . . automatically" as required in 26 U.S.C. § 5845(b) if it has a specific configuration of objective structural features that, in the absence of any minor defect, would give the weapon the capacity to shoot automatically. Because the challenged phrase relies on the objective features of the device even when it is combined with the statutory phrase "framer or receiver," the panel rejected the defendant's contention that the phrase is unconstitutionally vague on its face.

Finding no plain error, the panel rejected the defendant's challenge to the particular definition of "machinegun" that was used in the jury instructions in this case, and concluded that the defendant had fair notice that a particular exhibit qualified as such a device based on its configuration of

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

objective features. The panel therefore rejected the defendant's as-applied vagueness challenge, as well as his contention that the evidence was insufficient to sustain his convictions.

As to the defendant's challenges that apply only to his conviction for possession of an unregistered firearm under § 5861(d), the panel held that any errors in declining to order discovery, in the introduction of a no-record certificate, and concerning whether the Government had to prove that the exhibit was registered to a particular gun-parts supplier were harmless.

Because the § 922(*o*) charge is a lesser-included offense of the § 5861(d) offense, and because neither statute indicates that the Government authorized cumulative punishments to be imposed simultaneously under both provisions, the panel held that the two convictions are improperly multiplicitous and remanded for the district court to vacate one of the two convictions.

## COUNSEL

Davina T. Chen (argued), Glendale, California, for Defendant-Appellant.

Angela W. Woolridge (argued), Assistant United States Attorney; Robert L. Miskell, Appellate Chief; United States Attorney's Office, Tucson, Arizona; for Plaintiff-Appellee.

**OPINION**

COLLINS, Circuit Judge:

Defendant-Appellant Thomas Kuzma appeals his convictions for possession of a machinegun in violation of 18 U.S.C. § 922(*o*) and possession of an unregistered machinegun in violation of 26 U.S.C. § 5861(d). He argues that the statutory definition of "machinegun" underlying both counts is unconstitutionally vague and that, to the extent the term does have any determinate meaning, the device he possessed does not qualify as a machinegun. We disagree with these contentions and with most of the other challenges that Kuzma raises to his convictions. However, because we agree that Kuzma's two convictions are improperly multiplicitous, we remand to the district court with instructions to vacate one of the two convictions.

**I**

**A**

Thomas Kuzma was the manager of D&D Sales and Manufacturing ("D&D"), a supplier of gun parts in Tucson, Arizona. D&D operated out of a residence owned by its co-founder, Donald Tatom, and at all relevant times, Kuzma lived alone in that residence. After an investigation suggested that D&D might be involved with unlawful machineguns, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") obtained a search warrant for D&D's premises in early 2017. The search warrant was executed on March 21, 2017, and during the search, ATF agents found an "Uzi-type" receiver on a shelf in the garage,

which functioned as D&D's workshop.[1]  The receiver was later marked as Government's Exhibit 12 at trial, and we therefore will refer to it as "Exhibit 12."  As shown in a photograph attached to the report of the Government's firearms expert (William Swift), Exhibit 12 looked like this at the time ATF seized it:



---

[1] A "receiver" is the part of a firearm that "provides housing" for the hammer, bolt, and firing mechanism, and that "is usually threaded at its forward portion to receive the barrel." 27 C.F.R. § 478.11. A "bolt" is a "sliding metal bar that positions the cartridge" at the "breech" (back) end of the barrel, "closes the breech, and ejects the spent cartridge" after each shot is fired. *Bolt*, AMERICAN HERITAGE DICTIONARY (5th ed. 2018).  As we explain below, the relevant statutory definition of "machinegun" includes, not just a fully operational machinegun, but also the "frame or receiver" of such a weapon. *See infra* at 15–16.

In the condition in which it was found, Exhibit 12 could not shoot at all, much less shoot automatically.[2] The device was missing certain components needed to make it operable, including the bolt, some springs, and the top cover. It did, however, contain a machinegun barrel at the front, as well as a machinegun feed ramp. Swift's report contained the following photograph showing the position of the machinegun feed ramp:



Exhibit 12 lacked a "blocking bar," which is a piece of metal that is welded into the receiver of a semi-automatic firearm to prevent an unmodified machinegun bolt from

---

[2] Automatic firing means that the weapon can fire "more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). By contrast, a weapon fires semi-automatically if it "requir[es] a squeeze of the trigger for each shot" but each such squeeze "[e]ject[s] a shell and load[s] the next round of ammunition automatically." *Semiautomatic*, AMERICAN HERITAGE DICTIONARY (5th ed. 2018).

being used. A blocking bar, however, is not a foolproof method for preventing automatic operation. As Swift testified at trial, there are machinegun bolts that "have a slot machined into them," which allows them to fit in a gun with a blocking bar. Nonetheless, ATF has generally taken the position that a receiver with a blocking bar will not be deemed to be a machinegun. The following photograph from Swift's report shows where the holes were on Exhibit 12 for installing a blocking bar:



About a month after Exhibit 12 was seized, Swift tested it at an ATF facility. Using parts from that facility, Swift added the missing features needed to make Exhibit 12 an operable weapon. He installed an automatic bolt, as well as a machinegun top cover. Because the barrel that was on Exhibit 12 when it was seized was fitted for .45 caliber ammunition and Swift did not have a compatible bolt, Swift removed that barrel and replaced it with a 9mm barrel. He

also added a compatible magazine.  His report included this photograph of the pieces he added:



Swift tested the fully assembled weapon, and it fired automatically.  As shown in the photograph accompanying Swift's report, Exhibit 12 looked like this when it was fully assembled (the arrow identifies the position of the device's selector switch, which was set for automatic operation):



During and after the search, Kuzma made several statements to ATF investigators. To facilitate the execution of the search warrant at D&D, Agent Alexander Tisch used a ruse to get Kuzma to meet him about a quarter-mile away from the property. When Kuzma arrived, Tisch asked him to sit in Tisch's vehicle so that he could explain what was going to happen. Tisch stated that the ATF agents would be looking for machineguns, and Kuzma replied that they would find one on a shelf in the garage. When Tisch asked whether that device would function as a machinegun, Kuzma responded, "Yes, it will." Kuzma also admitted to Tisch that he did not have the "special" firearms license that would allow him to deal in machineguns. After this conversation, Tisch left Kuzma to participate in the search, but he subsequently went back to Kuzma to show him Exhibit 12 as well as another firearm that had been found. Kuzma identified Exhibit 12 as the machinegun that he had referred to earlier, and he stated that the other firearm was only a semi-automatic. In distinguishing between the two

weapons, Kuzma noted that Exhibit 12's blocking bar had been removed, but the other device still had one welded in.

The next day, Tisch again spoke with Kuzma, this time by phone. Kuzma again stated that Exhibit 12 was a machinegun, and he added that it had not had a blocking bar for "[a]bout a month." Tisch spoke again with Kuzma in person on March 29, and Kuzma admitted that, although Donald Tatom had asked him to get the sort of license that would cover certain special types of firearms (such as machineguns), Kuzma had "just forgot[ten]" to do that.

**B**

Kuzma was indicted on two counts based on his possession of Exhibit 12 at D&D. Specifically, Kuzma was charged with possession of a "machinegun" in violation of 18 U.S.C. § 922(*o*) and with possession of an unregistered machinegun in violation of 26 U.S.C. § 5861(d).

In attempting to demonstrate at trial that Exhibit 12 was a "machinegun" for purposes of § 922(*o*) and § 5861(d), the Government relied principally on Tisch's testimony concerning Kuzma's statements and the search, as well as on Swift's examination and testing of Exhibit 12. In trying to show that Exhibit 12 was unregistered, the Government relied on Tisch to describe the National Firearms Registration and Transfer Record ("NFRTR") created under 26 U.S.C. § 5841. Tisch explained that certain types of firearms regulated under the National Firearms Act ("NFA"), such as machineguns, must be registered in the NFRTR. Tisch testified that he inquired as to whether Exhibit 12 was registered to Kuzma in the NFRTR, and in response he received a "Record Search Certificate" prepared by another ATF employee, stating that there was no record

that a device bearing Exhibit 12's serial number was registered to Kuzma.

Kuzma testified in his own defense at trial. He stated that he knew that ATF considered Exhibit 12 to be a machinegun due to the lack of a blocking bar, but he claimed that in the initial interview with Agent Tisch, he had said that Exhibit 12 was *not* a machinegun. On cross-examination, however, Kuzma acknowledged that he "[a]pparently . . . did" tell Tisch that Exhibit 12 was a machinegun, but he stated that he "didn't recall that until [he] read the transcript" of that interview.

Kuzma further claimed that a September 23, 2005 letter from ATF to Donald Tatom "exempt[ed] us from that"—*i.e.*, ATF's view that Uzi-type receivers without blocking bars were machineguns—"until we sell these to the public." That letter explained that a particular "Uzi-type receiver *stamping*"[3] submitted by D&D to ATF did *not* constitute a "machinegun," but the letter also warned that, if the stamping was assembled into a "complete UZI receiver," it "must have a bolt blocking bar installed." The letter therefore cautioned D&D to advise its customers "that a bolt blocking bar must be installed to prevent the possession of an unregistered machinegun." Kuzma asserted that, even though Exhibit 12 was a complete Uzi-style receiver, it was

---

[3] As Swift explained at trial, a receiver "stamping" consists of the main "metal channel without the trunnion"—which he described as the part at the front of the receiver "that holds the barrel in place"—and without the "rear back plate." It is called a "stamping," because it generally consists of a stamped piece of metal that is folded into shape with holes cut out for other items to be added. *See Stamping*, WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. 1934) ("Something stamped out of another piece, as by machinery, or pressed or drawn into a definite shape from a blank.").

equivalent to the *stamping* discussed in the September 2005 letter and therefore, under his reading of that letter, such a device is "not a machine gun until it was sold to the public."

Kuzma acknowledged that D&D was never licensed to manufacture NFA firearms, a category that includes machineguns. He and other witnesses at trial referred to the necessary license as an "SOT," after the Special Occupational Tax that accompanies such licensing. He claimed that he did not think that he needed such a license for the "testing" that he was doing, which in his view did not involve "manufacturing."[4] In this regard, Kuzma insisted that, when he told Timothy Sink, a D&D employee, to remove the blocking bar from Exhibit 12, he did so only to enable D&D to test bolts. Kuzma insisted that Exhibit 12 "was never intended for anything but shop testing." Kuzma testified that he told Sink to put the blocking bar back into the receiver after the testing was completed, but Sink failed to do so.

As to whether Exhibit 12 had been registered in the NFRTR, Kuzma testified that he "didn't register it because it wasn't a machine gun."

Relying on the September 2005 letter, Kuzma requested a jury instruction on the affirmative defense of entrapment by estoppel. In a written pre-trial order, however, the district court had concluded that there was insufficient evidence to permit such a defense because the device discussed in that

---

[4] Tisch testified that, during one of his interviews, Kuzma stated that Tatom had "been telling him for two to three years to get an SOT," but that he "just never got around to it." D&D's office manager (Tammy Loeffler) testified at trial that she had prepared the necessary applications, but they "just hadn't been mailed yet" at the time that the search warrant was executed.

letter was not the same as Exhibit 12. After the close of the evidence at trial, the district court again reached the same conclusion, and the court therefore denied the requested instruction.**[5]**

After less than two hours of deliberation, the jury returned a verdict of guilty on both counts. Both before and after the verdict, Kuzma moved for a judgment of acquittal on the ground that, *inter alia*, there was insufficient evidence that Exhibit 12 was a machinegun, but the district court denied these motions.

At sentencing, Kuzma argued that he could only be sentenced on one of the two counts because the § 922(*o*) count was a lesser-included offense of the § 5861(d) count. The district court rejected that argument and sentenced Kuzma to concurrent sentences of three years' probation on both counts.

Kuzma timely appealed, and we have jurisdiction under 28 U.S.C. § 1291.

## II

Kuzma's primary contention on appeal is that one aspect of the statutory definition of "machinegun" is unconstitutionally vague and that, because both counts rest on that same definition, his convictions must be reversed.**[6]**

---

**[5]** Kuzma does not challenge this ruling on appeal.

**[6]** In the district court, Kuzma never squarely raised the contention that the definition of machinegun was unconstitutionally vague, and arguably we could deem the issue forfeited and therefore subject only to plain error review. But the Government has not argued that Kuzma's vagueness challenge is forfeited, thereby itself forfeiting that objection.

Alternatively, Kuzma argues that his convictions rest on an erroneously expansive reading of the term "machinegun" and that, under the correct definition, there is insufficient evidence to show that Exhibit 12 was a machinegun. We reject these contentions.

## A

The Due Process Clause prohibits the Government from "taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 135 S. Ct. 2551, 2556 (2015). In assessing whether a statute is impermissibly vague, "the touchstone is whether the statute, *either standing alone or as construed*, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997) (emphasis added). Because analysis of the statutory text in light of the applicable canons of construction may negate or eliminate the claimed vagueness, we begin by considering the proper construction of the challenged provision. *See McDonnell v. United States*, 136 S. Ct. 2355, 2375 (2016) (statutory construction of relevant terms may "avoid[] the vagueness concerns raised" by a defendant).

---

*See*, *e.g.*, *United States v. Schlesinger*, 49 F.3d 483, 485 (9th Cir. 1994) ("This court will not address waiver if not raised by the opposing party."). Moreover, Kuzma's arguments on this score overlap significantly with his contentions below that ATF's line-drawing in this area was arbitrary and standardless. Accordingly, we will proceed to consider this issue de novo, which both sides agree is the applicable standard of review.

**1**

For purposes of 18 U.S.C. § 922(*o*), which is the basis for Kuzma's first count of conviction, "[t]he term 'machinegun' has the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b))." *See* 18 U.S.C. § 921(a)(23). Kuzma's second count of conviction rests on § 5861(d) of the NFA, which makes it unlawful for a person "to receive or possess a firearm which is not registered to him" in the NFRTR. *See* 26 U.S.C. § 5861(d). For purposes of the NFA, a "firearm" means only certain particular categories of weapons, including "a machinegun." *Id.* § 5845(a)(6). The NFA's definition of "machinegun" in § 5845(b) therefore applies to both counts.

Section 5845(b), in turn, provides as follows:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b). The Government does not contend that Exhibit 12, in the state in which it was found, is *itself* a "weapon" that "shoots, is designed to shoot, or can be readily restored to shoot" automatically. *Id.* Rather, both in the

district court and in this court, the Government has placed dispositive weight on the theory that Exhibit 12 is the "*frame or receiver*" of such a weapon.  In providing that the "frame or receiver of any *such* weapon" is also a machinegun, the second sentence of § 5845(b) clearly refers back to the "weapon" described in the first sentence, *i.e.*, "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  *Id.* (emphasis added); *see also United States v. Wonschik*, 353 F.3d 1192, 1197–98 (10th Cir. 2004).    Exhibit  12  is  thus  a "machinegun" under this definition if it is the "frame or receiver" of a weapon that "shoots, is designed to shoot, or can be readily restored to shoot" automatically.[7]

Kuzma argues only that the second category—*i.e.*, a weapon that "is *designed* to shoot" automatically—is unconstitutionally vague, and so that is the key phrase whose meaning we must consider.  Because "designed to shoot" is not further defined by the statute, we give that phrase its ordinary meaning. *Johnson v. United States*, 559 U.S. 133, 138 (2010).  In addressing a vagueness challenge to a local

---

[7] The remaining portions of the statutory definition are not relevant here.  The Government has not contended that Exhibit 12 qualifies as a "machinegun" on the theory that it is a "*part* designed and intended solely and exclusively . . . for use in converting a weapon into a machinegun."  26 U.S.C. § 5845(d) (emphasis added).  At trial, the Government's examination of Swift did appear to suggest that Exhibit 12 could be deemed to be a machinegun on the theory that, together with other items in the garage, it constituted a "combination of parts from which a machinegun can be assembled," *id*., but the Government has not pressed this theory on appeal.  Moreover, Swift's unadorned assertion that the D&D garage somewhere contained some unspecified parts that, together with Exhibit 12, could be assembled into a machinegun is too conclusory to provide sufficient evidence to sustain Kuzma's conviction on that basis.

ordinance that regulated any item "*designed* . . . for use with illegal cannabis or drugs," the Supreme Court noted that a "principal meaning of 'design' is '[t]o fashion according to a plan.'" *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 491, 501 (1982) (quoting Webster's New International Dictionary 707 (2d ed. 1957)) (emphasis added). Given that primary meaning of "designed," the Court explained that "[i]t is therefore plain that the standard encompasses at least an item that is principally used with illegal drugs *by virtue of its objective features*, *i.e.*, features designed by the manufacturer." *Id.* at 501 (emphasis added); *see also id.* ("the phrase refers to *structural characteristics* of an item") (emphasis added). An item's "design" thus focuses on its objective "pattern or configuration of elements." *See Design*, Black's Law Dictionary (11th ed. 2019).

We therefore reject Kuzma's contrary contention that, to the extent "designed to shoot" has a discernible meaning, it refers to the *subjective* "intent or purpose of the designer or manufacturer" and therefore does not apply to a device that the maker did not subjectively intend to be used to shoot. Indeed, a different portion of the same "machinegun" definition expressly covers "parts designed *and intended[]* for use in converting a weapon into a machinegun." 26 U.S.C. § 5845(b) (emphasis added). That the relevant phrase *here* is "designed to shoot"—and not "designed and intended to shoot"—supports our conclusion that this phrase requires a purely objective examination of the design features of the device and not an inquiry into the manufacturer's subjective intent. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that

Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") (citation omitted).

Although (as Kuzma notes) *Hoffman Estates* described the term "designed" as referring "to the design *of the manufacturer*," 455 U.S. at 501 (emphasis added), the Court made clear that the subjective intent of the manufacturer is relevant only insofar as it is reflected in the "objective features" of the product, *id.* Quoting from the brief of the ordinance's challengers, the Court noted that they had essentially conceded as much: "if any intentional conduct is implicated by the phrase, it is the intent of the 'designer' (i.e. patent holder or manufacturer) whose intent for an item or 'design' *is absorbed into the physical attributes, or structural 'design' of the finished product*." *Id.* at 501 n.19 (emphasis added). Likewise, in *United States v. Reed*, 726 F.2d 570 (9th Cir. 1984), we addressed whether a device was "designed . . . for use as a weapon"—and thus might qualify as a "destructive device" under 26 U.S.C. § 5845(f)—by "look[ing] to the *apparent* purpose for which the device was created" and considering whether it bore the "traditional indicia of a weapon." *Id.* at 576 (emphasis added).[8]

---

[8] Kuzma's reliance on *United States v. Fredman*, 833 F.2d 837 (9th Cir. 1987), is unavailing. There, we addressed the separate portion of § 5845(f) that classifies as a destructive device "any combination of parts either *designed or intended* for use in converting any device into a destructive device." 26 U.S.C. § 5845(f)(3) (emphasis added). We concluded that, "*absent proof of original design or redesign* for use as a weapon," subjective "[i]ntent is a necessary element" and that the defendant's intent had "not been established." 833 F.2d at 839 (emphasis added). *Fredman*'s emphasis on the user's subjective intent thus did not rest on § 5845(f)(3)'s use of the word "designed" but rather on its use of the word "intended." The portion of the definition of "machinegun" at

We note, however, that because the design of an item turns on its *apparent* purpose as reflected in its particular configuration of structural features, *see Reed*, 726 F.2d at 576, a device remains "designed" for a particular use even though, due to a readily fixable defect, the device cannot at the moment be put to that use: a car with a dead battery is still "designed" to be driven. *See United States v. McCauley*, 601 F.2d 336, 338, 341 (8th Cir. 1979) (construing "designed to shoot . . . automatically" as including defendant's "type-96 machinegun" even though it "lacked the magazine necessary for automatic firing," given that the trial evidence showed that such magazines could be obtained). This construction of the phrase "weapon which . . . is designed to shoot" also avoids rendering it wholly redundant with the phrase "weapon which shoots." *See Ratzlaf v. United States*, 510 U.S. 135, 140–41 (1994). However, for such a non-operational device to be "designed to shoot . . . automatically," it must be apparent from the device's specific arrangement of objective design features that the device would ordinarily shoot automatically but for some minor flaw that temporarily impedes that function. By contrast, we agree with the Eighth Circuit in *McCauley* that if the deficiency that impedes automatic operation is significant and not readily repaired, then it cannot fairly be said that the device is one that is "designed to shoot . . . automatically." *See* 601 F.2d at 341 (explaining that "designed to shoot . . . automatically" does not include "devices lacking 'irreplaceable' parts necessary to shoot automatically" or "a device that no reasonable effort could render capable of automatic fire").

---

issue here, by contrast, uses only the word "designed" and not the word "intended." *See supra* at 17–18.

We therefore conclude that a weapon is "designed to shoot" automatically if it has a specific configuration of objective structural features that, in the absence of any minor defect, would give the weapon the capacity to shoot automatically.

**2**

Having thus considered the proper construction of the challenged statutory phrase, we have little difficulty rejecting Kuzma's contention that the phrase is unconstitutionally vague on its face.[9]  By focusing on whether a device has a specific configuration of *objective* features that, absent a minor defect, would give it the capacity to shoot automatically, the phrase a "weapon which . . . is designed to shoot . . . automatically" provides both sufficient notice as to what is prohibited and sufficient guidance to prevent against arbitrary enforcement.  In *Hoffman Estates*, the Supreme Court rejected a facial vagueness challenge to a comparable phrase ("designed . . . for use") precisely on the ground that the phrase's focus on the "objective features" and "structural characteristics" of an item was sufficient to provide fair warning for purposes of a facial challenge.  455 U.S. at 501–02.  The Court concluded that, while that objective standard could give rise to "ambiguities" as applied in some specific contexts, any such residual issues were "of no concern in this facial challenge." *Id*. at 502.  Applying similar reasoning here, we conclude that the challenged phrase is not unconstitutionally vague on its face.  If anything, it is *Kuzma's* reading of the statute that

---

**9** We likewise reject Kuzma's contention that § 5845(b) is vague as applied to him.  We address that issue separately below, together with Kuzma's challenge to the sufficiency of the evidence. *See infra* at 29–32.

would raise serious vagueness concerns: by focusing on the manufacturer's *subjective* intention in making a device, Kuzma's construction would make it difficult, if not impossible, for subsequent possessors of the device to determine whether it had been "designed to shoot" automatically in that subjective sense. *Cf. Flipside, Hoffman Estates, Inc. v. Village of Hoffman Estates*, 639 F.2d 373, 381 & n.18 (7th Cir. 1981) (addressing the subjective reading of "designed . . . for use" that the Supreme Court later rejected and observing that, "[i]f this were a criminal ordinance, subjecting retailers and customers to prosecution based solely on the design intent of a third party, the manufacturer, there would be little question as to the law's invalidity").

Kuzma relies on the Supreme Court's recent decisions facially invalidating several statutory provisions that relied on impermissibly vague descriptions of predicate offenses, but none of this caselaw warrants a different conclusion from the one suggested by *Hoffman Estates*. In *Johnson*, for example, the Court addressed the so-called "residual clause" of the Armed Career Criminal Act, which defined as a "violent felony" (which warrants enhanced punishment) four enumerated felonies and any other felony that "'otherwise involves conduct that presents a serious potential risk of physical injury to another.'" 135 S. Ct. at 2555–56 (quoting 18 U.S.C. § 924(e)(2)(B)). Under the "categorical approach" that applied to evaluating which predicate offenses qualified as "violent felon[ies]" under the residual clause, a court was required "to picture the kind of conduct that the [predicate] crime involves in 'the *ordinary* case'"—and not the conduct actually involved in the defendant's case—"and to judge whether that abstraction presents a serious potential risk of physical injury." *Id.* at 2557 (emphasis added). That inquiry, the Court held, was

too "indetermina[te]" to satisfy due process standards. *Id.* In reaching that conclusion, the Court placed dispositive weight on the fact that this inquiry involved application of an "imprecise 'serious potential risk' standard" to a "judge-imagined abstraction"—*i.e.*, the "judicially imagined 'ordinary case' of a crime"—rather than to "real-world facts." *Id.* at 2557–78; *see also United States v. Davis*, 139 S. Ct. 2319, 2326–27 (2019) (applying comparable reasoning to "residual clause" in 18 U.S.C. § 924(c)(3)(B)); *Sessions v. Dimaya*, 138 S. Ct. 1204, 1214–15 (2018) (applying similar reasoning as to "residual clause" of 18 U.S.C. § 16(b)). Nothing comparable is involved here, in which an objective standard about the actual features of a device is to be applied to the real-world facts of the defendant's specific device.[10]

Kuzma nonetheless argues that, as illustrated in the testimony of the ATF expert at trial, ATF has taken a series of internally contradictory and arbitrary positions concerning which devices do and do not count as "designed to shoot" automatically. This contention is ultimately irrelevant to Kuzma's facial challenge. Although inconsistency in ATF's position on the classification of a particular device could perhaps be an indicator of an *as-applied* vagueness problem, it has no bearing on the statute's underlying meaning or whether that meaning is impermissibly vague on its face. This is not a situation in which an agency has been delegated authority to promulgate underlying *regulatory* prohibitions, which are then enforced by a criminal statute prohibiting willful violations of those regulations. *See*, *e.g.*, 49 U.S.C. § 5124(a) (imposing

---

[10] The facial invalidations in these three cases do, however, refute the Government's assertion that, outside the First Amendment context, only as-applied vagueness challenges may be considered.

criminal penalties on any "person . . . willfully or recklessly violating . . . a regulation . . . issued under this chapter"). On the contrary, the text of the applicable prohibitions and definitions is set forth in *statutory* language. Because "criminal laws are for courts, not for the Government, to construe," the Supreme Court has repeatedly rejected the view "that 'the Government's reading of a criminal statute is entitled to any deference.'" *Abramski v. United States*, 573 U.S. 169, 191 (2014) (quoting *United States v. Apel*, 571 U.S. 359, 369 (2014)). Thus, in *Abramski*, the Supreme Court explained that it "put aside" ATF's about-face in how the agency construed the statutory provision at issue there by pointedly observing: "We think ATF's old position no more relevant than its current one—which is to say, not relevant at all." *Id.* at 191.

Lastly, we reject Kuzma's contention that the challenged phrase ("designed to shoot . . . automatically") is impermissibly vague when *combined* with § 5845(b)'s inclusion of "receiver[s]" in the definition of "machinegun." As explained earlier, the definition of "machinegun" includes, not just a "weapon which shoots, [or] is designed to shoot . . . automatically," but also the "frame or receiver of any such weapon." 26 U.S.C. § 5845(b). Thus, a defendant need not be shown to have possessed a fully assembled machinegun, but may be shown to have possessed just the frame or receiver of such a weapon. As Kuzma's counsel confirmed at oral argument, Kuzma has not raised a vagueness challenge to the statute's use of the term "receiver," and we perceive no basis for concluding that that term, when combined with the phrase "designed to shoot . . . automatically," renders the resulting definition vague on its face. Under the plain language of the statute, a device can only be said to be the "frame or receiver" of a "weapon which . . . is designed to shoot . . . *automatically*"—as

opposed to the frame or receiver of a "weapon which . . . is designed to shoot" *simpliciter*—if the receiver *itself* contains a configuration of objective features that (when the remainder of the firearm is added to the receiver) would give the weapon the specific capacity to fire automatically. *See* 26 U.S.C. § 5845(b) (emphasis added). Consequently, a receiver that is in all respects merely a common-denominator subcomponent of *either* a semiautomatic weapon or an automatic weapon cannot be said to be a receiver of a "weapon which . . . is *designed* to shoot . . . *automatically*." Because the challenged phrase continues to rely on the objective features of the device even when it is combined with the phrase "frame or receiver," it is not void for vagueness in that context either.

*       *       *

We therefore reject Kuzma's argument that the phrase "weapon which . . . is designed to shoot . . . automatically" in § 5845(b) is unconstitutionally vague on its face.

## B

Kuzma also raises a variety of challenges concerning the application of § 5845(b) in his particular case, but we conclude that all of them are meritless.

## 1

As an initial matter, Kuzma challenges the particular definition of "machinegun" that was used in the jury instructions in this case—even though his own counsel was the one who suggested adding the very language that Kuzma now attacks as legally erroneous. Citing *United States v. Guthrie*, 931 F.2d 564, 567 (9th Cir. 1991), the Government argues that, as a result, review of this issue is barred by the

invited-error doctrine. But in *United States v. Perez*, 116 F.3d 840 (9th Cir. 1997) (en banc), this court distinguished *Guthrie* and held that an error "induced or caused" by the defendant remains subject to plain error review unless, in inviting the error, "the defendant intentionally relinquished or abandoned a known right." *Id*. at 845. The parties dispute whether the record reflects such a relinquishment here, but we need not resolve this issue. Even applying plain error review, we find no basis for reversal on account of this instruction.

The jury instructions in this case defined "machinegun" by repeating verbatim the entire text of the definition contained in § 5845(b). The instructions, however, also contained some additional language, including the following portion that Kuzma belatedly challenges on appeal:

> The "designed" definition includes weapons which have not previously functioned as machineguns but possess specific machinegun design features which facilitate automatic fire by simple alteration or elimination of existing component parts.

Kuzma contends that this definition was erroneous because, in his view, the statute requires a focus on the manufacturer's subjective intention in creating the device. We have already rejected that contention, and so there was no plain error in the instruction's objective focus on "specific machinegun design features which facilitate automatic fire."

We likewise find no plain error here in the instruction's reference to features that facilitate automatic fire "by simple alteration or elimination of existing component parts." On the one hand, this phrase arguably could be read to go beyond the statute's reach by literally including devices that can *acquire* an automatic capacity, *not already reflected in their existing design*, "by simple alteration or elimination of existing component parts." On the other hand, the latter phrase could perhaps be narrowly construed as referring merely to the correction of minor flaws or defects that may prevent a particular device from functioning in accord with its *existing* objectively apparent design, which would be consistent with the statute. We need not resolve this issue because, even assuming that this aspect of the instruction was erroneous, it did not affect Kuzma's substantial rights. *See United States v. Olano*, 507 U.S. 725, 734–35 (1993). As we explain below, on the facts of this case, any automatic capacity that inhered in the objective design of Exhibit 12 *already* existed at the time Kuzma possessed it. *See infra* at 27–29. There is thus no reasonable possibility that the jury here relied on an impermissibly expansive reading of this instruction in convicting Kuzma.

**2**

Applying the correct definition of "machinegun," we conclude that Kuzma had fair notice that Exhibit 12 qualified as such a device based on its configuration of objective features. We therefore reject his as-applied vagueness challenge, as well as his contention that the evidence was insufficient to sustain his convictions.

**a**

Because it is not a complete weapon that, by itself, was designed to shoot, Exhibit 12 qualifies as a "machinegun" only if it is the "frame or receiver" of a weapon that "shoots, [or] is designed to shoot . . . automatically."[11]  26 U.S.C. § 5845(b).  As we have explained, Congress's directive that the "frame or receiver" of a "machinegun" also qualifies as a "machinegun" unmistakably confirms that the statute reaches the core *subcomponent* of an automatic weapon, even if that device by itself cannot shoot at all.  But to count as the relevant core of a machinegun (as opposed to some other firearm), a frame or receiver must itself contain a configuration of objective design features that facilitate automatic fire, as demonstrated by the fact that, when the remaining missing features of a complete firearm are *added* to the receiver, the resulting weapon shoots, or is designed to shoot, automatically.  *See supra* at 16–20.  Under this standard, Exhibit 12 was plainly a machinegun.

Kuzma does not contest that Exhibit 12 had enough of the core features of a firearm to qualify as a "frame or receiver."  And because Exhibit 12 had its blocking bar removed, its objective design features facilitated automatic firing, as shown by the fact that, when Swift added the few remaining features needed to complete an operational firearm (namely, a bolt and top cover), Exhibit 12 fired automatically.  *See supra* at 6–8.  This conclusion is not altered by the fact that, in adding the remaining features,

---

[11] Because Exhibit 12 had not previously been part of a complete automatic weapon, it was concededly not the "frame or receiver" of a "weapon which . . . [could] be readily *restored* to shoot[] automatically." 26 U.S.C. § 5845(b) (emphasis added).  And as explained earlier, none of the other clauses of § 5845(b)'s definition applied to Exhibit 12.  *See supra* note 7.

Swift swapped out the existing barrel for a different one that matched one of the bolts he had available. A barrel is not itself part of a receiver, and so the swap cannot have altered the design of the receiver. In any event, such an even swap of features does not materially alter the functionality of the resulting operable firearm and has no bearing on whether it does or does not qualify as a machinegun. Moreover, Kuzma himself admitted in his statements to Tisch that he knew that the features of Exhibit 12 were such that, when the remaining missing pieces to create an operable firearm were installed on Exhibit 12, the device would shoot automatically. *Cf. Staples v. United States*, 511 U.S. 600, 619 (1994) (holding that the Government must show that the defendant knew the device had the characteristics that brought it within the scope of the NFA); *United States v. Rogers*, 94 F.3d 1519, 1523 (11th Cir. 1996) (same as to § 922(*o*)), *cert. dismissed*, 522 U.S. 252 (1998). The trial evidence was thus sufficient to show that, at the time Kuzma possessed it, Exhibit 12 had the objective features necessary to establish that it was the "frame or receiver" of a "weapon which shoots, [or] is designed to shoot . . . automatically."

26 U.S.C. § 5845(b).[12]   It therefore was a "machinegun" within the plain language of § 5845(b).[13]

## b

Kuzma nonetheless contends that the statute is vague as applied to him, because ATF issued contradictory guidance concerning receivers just like Exhibit 12, thereby confirming that the statute's coverage of such devices was fatally unclear even to ATF.  The trial evidence showed that ATF had indeed sent two inconsistent letters to D&D concerning whether a certain receiver *stamping* qualified as a

[12] At oral argument, Kuzma suggested that, in the context of an operational firearm that is assembled from a receiver, the receiver alone, in its earlier state, can be said to have been the receiver of a weapon which *will* shoot automatically, but not of one which "*shoots . . . automatically.*"  26 U.S.C. § 5845(b) (emphasis added); *cf.* 18 U.S.C. § 921(a)(3) (defining "firearm" as, *inter alia*, "any weapon . . . *which will* or is designed to or may readily be converted to *expel a projectile*") (emphasis added).  We doubt that the use of the present tense rather than the future tense in § 5845(b) makes any difference, *see*, *e.g.*, 1 U.S.C. § 1 ("unless the context indicates otherwise[,] . . . words used in the present tense *include the future* as well as the present") (emphasis added), but the point is ultimately irrelevant.  Exhibit 12 would clearly remain covered under § 5845(b) as the "frame or receiver" of a "weapon which . . . is designed to shoot . . . automatically."

[13] We reject Kuzma's contention that the district court erred in permitting Swift to offer his opinion that Exhibit 12 was a machinegun as defined by § 5845(b).  Because Kuzma failed to raise this objection in the district court, we review only for plain error, *see Olano*, 507 U.S. at 730 (citing FED. R. CRIM. P. 52(b)), and we find none.  *See United States v. Bishop*, 926 F.3d 621, 632–33 (10th Cir. 2019) (finding no plain error in allowing expert to testify that device was a machinegun when expert "adequately explained the basis for his opinion"); *see generally United States v. Diaz*, 876 F.3d 1194, 1197–99 (9th Cir. 2017) (finding no error when expert was asked questions "adopt[ing] the language of the elements").

"machinegun," but nothing in this evidence concerning the classification of that qualitatively different device bespeaks ambiguity as to the statute's coverage of Exhibit 12.

Only the second letter was received into evidence at trial, and it stated that ATF's prior letter to D&D had contained "an erroneous determination regarding the classification of your previously submitted UZI-type receiver stamping." Specifically, the letter stated that "[o]ur original classification of this item as a *machinegun* was not accurate." As the letter explained, the item ATF examined consisted of the folded metal receiver stamping, which had "various holes and slots, but no additional parts installed." The letter concluded that this receiver stamping, "as examined, does not possess the design features of an UZI-type machinegun receiver that facilitate automatic fire by simple modification of existing parts." However, the letter warned that, if this receiver stamping is "assembled into a *complete UZI receiver* by the installation of a back plate, barrel trunnion, and other receiver components, [it] must have a bolt blocking bar installed" and, "[i]f not, it will be considered a machinegun receiver." While the letter might suggest some subjective confusion on ATF's part as to exactly how to classify *stampings* that lack almost any other parts,[14] that does not somehow create uncertainty as to how

---

[14] For example, the letter could be read as taking the view that the folded stamping was too barebones to count as a "receiver," although that reading is hard to square with the letter's simultaneous insistence that the stamping was a "firearm." (The stamping could not possibly fit the definition of a "firearm" in 18 U.S.C. § 921(a)(3) unless it was a "receiver.") Alternatively, the letter could perhaps be read to suggest that, by itself, the stamping was too much of a least-common-denominator device to count as a *machinegun* receiver. *Cf. supra* at 23–24. But as Kuzma notes, at trial Swift appeared at one point to suggest that a folded receiver stamping with no additional parts *was* a

the statutory language objectively applies to Exhibit 12, which was *not* a mere stamping. On the contrary, because Exhibit 12 was a "complete UZI receiver" with "a back plate, barrel trunnion, and other receiver components," the letter's reasoning would likewise classify Exhibit 12 as "a machinegun receiver." The letter thus does nothing to suggest that the statute's application to Exhibit 12 creates an as-applied vagueness issue.

Kuzma argues that the statute is still vague as applied here because in his view ATF improperly attaches talismanic significance to the presence or absence of a blocking bar. But in assessing Kuzma's as-applied vagueness challenge, we need not address whether Swift correctly answered all of Kuzma's counsel's various hypotheticals as to which other devices with which other components would or would not count as machinegun receivers. In an as-applied challenge, the only question is whether the statute "'is impermissibly vague *in the circumstances of this case*.'" *United States v. Purdy*, 264 F.3d 809, 811 (9th Cir. 2001) (citation omitted). Even if Kuzma is correct in contending that design features *other* than blocking bars may sufficiently impede automatic operation so as to prevent a receiver from being classified as a machinegun receiver, that would not create any basis for finding § 5845(b) vague as applied here. As Swift explained, Exhibit 12 did not have *any* such alternative design features "that could have prevented it from functioning as a machine gun." Indeed, had Exhibit 12 possessed such features, it would not have fired

---

machinegun receiver, thus seemingly contradicting ATF's own about-face on that issue. Because it ultimately has no impact on the result in this case, we express no view as to which (if any) of these conflicting views about receiver stampings is correct.

automatically when Swift tested the fully assembled weapon.

"Because the controlling standard of conduct is reasonably clear and [Kuzma] clearly violated that standard, we hold that [§ 5845(b)] is not unconstitutionally vague as applied to [Kuzma]." *United States v. Agront*, 773 F.3d 192, 199 (9th Cir. 2014).

## III

Kuzma also raises several challenges that apply only to his conviction for possession of an unregistered firearm under 26 U.S.C. § 5861(d), but none of these points warrants reversal.

Prior to trial, Kuzma repeatedly sought to obtain information from the Government concerning the reliability of the recordkeeping in the NFRTR, but the district court declined to order such discovery. Kuzma renewed his objection to those prior rulings at trial when the Government sought to introduce a "Record Search Certificate" from ATF employee Jon Coleman stating that, "after [a] diligent search" of the NFRTR, Coleman "found no evidence" that a firearm bearing Exhibit 12's serial number was registered to Kuzma. Moreover, in doing so, Kuzma's counsel also specifically objected to the admission of that certificate, explaining that "it's not an accurate regist[er], the federal regist[er], and I don't have an opportunity to cross examine the person that's introducing it as to the accuracy of the federal regist[er]." Kuzma renews these points on appeal, arguing that discovery should have been ordered and that the introduction of the no-record certificate over his objection violated his rights under the Confrontation Clause.

Even if the district court erred in either or both of these respects, any error would be harmless. Kuzma expressly admitted at trial that he had not registered Exhibit 12, and he made the same admission in his earlier statements to Tisch. Whether the Government's registration records were adequate to show the absence of this concededly non-existent registration would thus not have altered the outcome. *United States v. Larson*, 495 F.3d 1094, 1107–08 (9th Cir. 2007) (en banc) (holding that Confrontation Clause error was harmless beyond a reasonable doubt in light of other testimony in the record).

Kuzma further argues, however, that § 5861(d) required the Government to prove that both Kuzma *and D&D* failed to register Exhibit 12. This contention appears doubtful, given that the plain text of the statute requires a registration that extends to each person who receives or possesses such a firearm: "It shall be unlawful for any person . . . to receive or possess a firearm which is not registered *to him* in the [NFRTR]." 26 U.S.C. § 5861(d) (emphasis added). But we need not resolve this issue, because the undisputed testimony at trial confirmed that Exhibit 12 was not registered to D&D either. As Tisch explained, Kuzma admitted that D&D did not have the requisite license for a machinegun, which (as noted earlier) the witnesses referred to at trial as an "SOT." *See supra* at 12.[15] Tisch further stated that Kuzma had told

---

[15] There are very limited circumstances in which a manufacturer can lawfully produce machineguns and register them. *See* 18 U.S.C. § 922(*o*)(2) (exempting, *inter alia*, possession "under the authority of[] the United States" or a state or local government); 27 C.F.R. § 479.105(c) ("The registration of such machine guns under this part and their subsequent transfer shall be conditioned upon and restricted to the sale or distribution of such weapons for the official use of Federal, State or local government entities."). Any such manufacturer (among others) is subject to the "special (occupational) tax." 26 U.S.C. § 5801(a).

him D&D's owner had been urging Kuzma "for two to three years to get an SOT," but to no avail.  In his trial testimony, Kuzma confirmed that he had asked Tammy Loeffler to prepare the authorization paperwork "about a week before" the search.  In turn, Loeffler admitted on cross-examination that she had never "obtained an SOT" on D&D's behalf, and she claimed that she had prepared the paperwork but failed to mail it out.  Accordingly, any error concerning whether the Government had to prove that Exhibit 12 was registered to D&D was harmless.  *See Neder v. United States*, 527 U.S. 1, 17–20 (1999).[16]

## IV

Finally, Kuzma contends that, even if his § 922(*o*) and § 5861(d) convictions are free from reversible error when considered *separately*, the two convictions are multiplicitous and cannot coexist *simultaneously*.  We agree.

Under the aspect of the Double Jeopardy Clause that protects against multiple punishments, "'cumulative sentences are not permitted'" for two statutes that proscribe the same offense, "'unless elsewhere specially authorized by Congress.'"  *Missouri v. Hunter*, 459 U.S. 359, 367 (1983) (quoting *Whalen v. United States*, 445 U.S. 684, 693 (1980)) (emphasis omitted); *see also United States v. Schales*, 546 F.3d 965, 977 (9th Cir. 2008).  The test for determining whether two statutes define the same offense is the familiar "*Blockburger* test," which asks "'whether each provision requires proof of a fact which the other does not.'"  *Id.*

---

[16] To the extent that we have concluded that certain potential errors were either harmless or not plain error, *see supra* at 32–34, we further conclude that the cumulative effect of any such potential errors is also harmless.  *United States v. Fernandez*, 388 F.3d 1199, 1256–57 (9th Cir. 2004).

(quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). Here, the Government concedes that § 922(*o*) does not require proof of any element that is not also required under § 5861(d). The former statute requires possession of an item that qualifies as a machinegun with knowledge of the essential characteristics that make that item a machinegun, *see* 18 U.S.C. §§ 922(*o*), 924(a)(2), and the latter statute requires all of those same elements (plus an additional element concerning the lack of registration), *see* 26 U.S.C. §§ 5845(a)(6), 5845(b), 5861(d), 5871. The § 922(*o*) charge is therefore a lesser-included offense of the § 5861(d) charge. The Government further concedes that neither statute (nor any other provision of law) indicates that Congress authorized cumulative punishments to be imposed simultaneously under both provisions. Because "[o]ne of the convictions, as well as its concurrent sentence, is unauthorized punishment," one of them must be vacated. *Ball v. United States*, 470 U.S. 856, 864 (1985). Given that the ultimate "sentencing responsibility resides" with the district court, the "only remedy consistent with congressional intent" is for that court "to exercise its discretion to vacate one of the underlying convictions." *Id.*; *see also Schales*, 546 F.3d at 980.

Accordingly, we remand the case to the district court with instructions to vacate one, and only one, of Kuzma's two convictions. We otherwise affirm the convictions and judgment in all other respects.

**AFFIRMED IN PART AND REMANDED.**