**NOT FOR PUBLICATION**

**FILED**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

JUN 29 2021

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

<table>
<tr><td>

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

HENRY CERVANTES; JAIME
CERVANTES; ALBERTO LAREZ; and
ANDREW CERVANTES

    Defendants-Appellants.

</td><td>

Nos.  16-10508, 16-10531,
       16-10537, 16-10538,
       17-10001

D.C. Nos.  4:12-cr-00792-YGR-1
          4:12-cr-00792-YGR-2
          4:12-cr-00792-YGR-4
          4:12-cr-00792-YGR-12

MEMORANDUM[*]

</td></tr>
</table>

Appeal from the United States District Court
for the Northern District of California
Yvonne G. Rogers, District Judge, Presiding

Argued and Submitted April 30, 2020
San Francisco, California

Before: WALLACE, GRABER, and COLLINS, Circuit Judges.

In these consolidated appeals, Defendants-Appellants Andrew Cervantes,

Henry Cervantes, Alberto Larez, and Jaime Cervantes[1] (collectively,

"Defendants") challenge their convictions and sentences for a variety of crimes

arising from their participation in *Nuestra Familia* ("Our Family" or "NF"), a

---

[*] This disposition is not appropriate for publication and is not precedent except as
provided by Ninth Circuit Rule 36-3.

[1] Although three of the Defendants have the same last name ("Cervantes"), they are
not related to one another. To avoid confusion, we will refer to those three
Defendants only by their first names.

violent prison gang operating in the Northern California prison system and elsewhere. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). We affirm in part and vacate and remand in part.

## I

The district court did not commit prejudicial error in admitting testimony from Bureau of Prisons ("BOP") Officer John Feeney, who provided his lay opinion regarding the meaning of coded language used in communications of NF members.

## A

Reviewing de novo, *see United States v. Wells*, 879 F.3d 900, 914 (9th Cir. 2018), we conclude that, in evaluating the admissibility of Officer Feeney's various opinions, the district court correctly applied Federal Rule of Evidence 701 rather than Rule 702. The district court declined to allow Feeney to testify based on a claimed "specialized knowledge" of gang or "drug jargon," but instead endeavored to confine him "to interpret[ing] ambiguous statements based on his general knowledge of the investigation." *United States v. Freeman*, 498 F.3d 893, 902 (9th Cir. 2007). In *Freeman*, we held that opinions of the latter sort are not those of "an expert but rather [of] a lay witness." *Id*. Rule 701, rather than Rule 702, thus provides the proper framework here. *See also United States v. Gadson*, 763 F.3d 1189, 1206–07 (9th Cir. 2014) (holding that Rule 701 applies to "an

2

officer's interpretation," based on his or her "direct knowledge of the investigation," of "'ambiguous conversations'" in "intercepted phone calls" (citation omitted)).  We review the district court's application of Rule 701's standards to the specific evidence in this case only for abuse of discretion.  *Id*. at 1209.

Gadson forecloses Defendants' arguments for a wholesale exclusion of Feeney's testimony.  In that case, we expressly rejected the argument that, in order for lay testimony about recorded conversations to be "based on the witness's perception," FED. R. EVID. 701, the witness must have been a "participant in the recorded conversation."  *Gadson*, 763 F.3d at 1207.  Instead, it suffices that "the testimony was based on the officer's 'direct perception of several hours of intercepted conversations . . . and other facts he learned during the investigation.'"  *Id*. (quoting *Freeman*, 498 F.3d at 904–05); *see also id*. at 1210 (holding that an officer with "personal experience and knowledge of the investigation" may provide lay opinion testimony about ambiguous content of phone calls where he "reviewed the phone calls in the context of that knowledge").  Defendants contend that Feeney lacked the necessary personal participation in the investigation of them, because his interactions with Defendants were limited and he did not participate in any surveillance of Defendants or searches of their cells.  The district court did not abuse its discretion in concluding that Feeney's many years of investigating and

3

reviewing NF correspondence and recorded conversations, including of Defendants, provided a sufficient basis to conclude that Feeney's testimony was based on facts he learned during his own investigation. *See Gadson*, 763 F.3d at 1207–1213; *Freeman*, 498 F.3d at 904–05.[2]

**B**

We further reject Defendants' challenges to certain specific aspects of Feeney's lay opinion testimony. The record reflects that the district court made considerable efforts to stay within the limitations of Rule 701, as construed in *Gadson* and *Freeman*. The district court carefully made opinion-by-opinion determinations, sustaining dozens of objections when it concluded that the Government had failed to lay a foundation to allow Feeney to opine on the meaning of particular coded terms. Defendants contend that the district court nonetheless erred in allowing Feeney to opine on a variety of specific terms, but we hold that there was no prejudicial abuse of discretion with respect to any of the points Defendants raise.

---

[2] Defendants argue that the "expert" nature of Feeney's testimony is confirmed by the fact that it extended to Defendants' *post-indictment* letters and calls. But Defendants cite no authority for imposing that temporal limitation on Rule 701, and nothing in the text of the rule supports it.

4

**1**

Defendants challenge, in particular, Feeney's testimony identifying the various female code names that the Defendants used to refer to particular NF members, including themselves, in communications from prison. For example, Feeney identified Andrew as "Lucy," Henry as "Heather," and Larez as "Becky" or "Rosa." We reject Defendants' challenges to these portions of Feeney's testimony.

As an initial matter, we find no merit in Defendants' objections to Feeney's testimony identifying the voices and handwriting of various NF members, including Sheldon Villanueva, one of two incarcerated "overseers" who ran NF. These are proper subjects for lay opinion testimony, *see* FED. R. EVID. 901(b)(2), (5), and the district court did not abuse its discretion in concluding that Feeney's familiarity with the relevant voices and handwriting, even if limited, was sufficient to provide a foundation for his identifications. *See United States v. Workinger*, 90 F.3d 1409, 1415 (9th Cir. 1996) (holding that rulings on foundation are reviewed only for abuse of discretion).

In light of these voice and handwriting identifications, we reject Defendants' contentions that the district court failed to require a sufficient foundation for Feeney's identification of the code names for various NF members. Although the methods Feeney used in each instance differed, and some foundations were laid

with more care than others, we conclude that there was no prejudicial abuse of discretion.

For example, with respect to Larez, the jury heard a recording of a portion of a phone call from Villanueva in which the latter provided a specific new phone number for "Rosa." After a clip from a subsequent phone call from Villanueva to that very number was played for the jury, Feeney identified the voice of the person who received that call as Larez. The jury then heard another call in which Villanueva referred to the "underdog" of "Rosa," and later in the same call, to the "underdog" of "Becky." Feeney interpreted this call as referring to a single "underdog" and that "Becky" and "Rosa" were the same person, *i.e.*, Larez. Feeney testified that this latter conclusion was also consistent with what he had observed in tracking other unspecified phone calls, financial records, and prison mail relating to "Becky." As to Henry, the jury heard a call in which Larez told Andrew that he would be at "Heather's house" in 30 minutes and that Andrew should call Larez back at that time so that he "could say hi to her." The jury also heard a clip from Andrew's call 40 minutes later to that same number in which he spoke with Henry. With respect to Andrew, Feeney testified that he had heard an unspecified call in which Andrew made a "slipup," referring to himself as "I" and then correcting himself and saying "Lucy."

Defendants complain that, in identifying Andrew as "Lucy," as well as in other instances, Feeney did not identify the *specific* conversations or records that led him to associate particular code names with particular persons. Defendants contend that, as a result, there was an inadequate foundation for the district court to permit Feeney to render an opinion or to conclude that any such opinion would be "helpful" to the jury. FED. R. EVID. 701(b). We disagree. Even if it would have been preferable for the Government to have provided a more detailed foundation for the identification of Andrew as "Lucy," the district court did not abuse its discretion. The district court could reasonably conclude that Feeney's testimony that he recalled a conversation in which Andrew had inadvertently identified himself as "Lucy" provided a sufficient foundation, even if Feeney did not supply the exact date of the conversation or other details about it. The lack of such details may have reduced the weight and persuasiveness of that testimony, but it did not render the testimony inadmissible.

**2**

We also reject Defendants' challenge to Feeney's testimony that certain coded conversations referred to "Polvo" carrying out an *assault* of "Demon."

As an initial matter, we note that the district court did *not* permit Feeney to provide an opinion as to who he thought "Polvo" and "Demon" were, because the district court repeatedly sustained defense objections that an inadequate foundation

7

had been laid for Feeney to provide such testimony. Instead, the identifications of "Polvo" as Ernest Killinger and "Demon" as Tobias Vigil were made by Bismarck Ocampo, a cooperating NF member who testified at trial. Ocampo further testified that Andrew told him that he had ordered a "hit" on "Demon" and that Demon "was hit and survived." Mario Ochoa-Gonzalez, a cooperating Norteño,[3] likewise testified that Andrew told him that he had been responsible for the "hit" on "Demon." The jury also heard testimony from a prison official that Vigil was assaulted at the United States Penitentiary ("USP") McCreary in Kentucky on March 27, 2013, during the course of the communications that Feeney discussed.

In the challenged testimony, Feeney stated that Andrew's communications about Polvo and Demon used coded language to refer to assaulting Demon. For example, Feeney was permitted to testify that Andrew's December 2012 letter stating that "Demonito is a waste of time" and that "Mom don't want him around the house" referred to assaulting Demon. Feeney testified that, over the course of his monitoring of mail and phone calls, he had observed that referring to an inmate as a "waste of time" was often followed by an assault on that person. Feeney also testified that "house" was a term commonly used by NF members to refer either to NF members in a particular location or to NF members overall. A subsequent

---

[3] As one witness explained at trial, a "Norteño is a gang member [who] functions under the NF and is guided by the NF," while the NF "is the governing body of the whole movement."

8

letter from Leonard "Manny" Vilches to Andrew relayed an inquiry from "prima polvo" as to whether there were "any other options for demona" given "how well she has been behaving lately, and what an asset she[']s been." Andrew responded to Vilches in a March 25, 2013 letter stating that, when Vilches spoke with "prima Polva," he should "let her know that it[']s still a yes." A subsequent letter from Vilches to Andrew stated, "speaking of Polva, I'll let her know to make sure she takes care of her things to do list for the summer," and Feeney also was permitted to opine that, "based on the previous letters," a further letter contained coded language for "assault Demon." Finally, Feeney opined that a responding letter that referred to "summer cleaning" meant "removing Demon."

We hold there was no prejudicial abuse of discretion in permitting this testimony. Feeney's opinions as to coded terms such as "waste of time" and "house" were based on his perceptions as to how those particular terms were used by NF members in the many communications that he reviewed over time. Although that testimony lacked details about the specific communications that led Feeney to develop that understanding of their usage of terms, the district court did not abuse its discretion in concluding that this testimony nonetheless provided a sufficient (albeit thin) foundation for his conclusions and that this testimony would be helpful to the jury in assessing the particular communications at issue. *Cf. Gadson*, 763 F.3d at 1209 (observing that the "out-of-court experiences" that

9

underlie opinions as to identity are what "make the witness's testimony helpful to the jury").[4]

As to Feeney's opinions in which he interpreted one letter presented to the jury based on *other letters* in the same chain of correspondence that were also presented to the jury, it is perhaps debatable whether such an opinion is "helpful" within the meaning of Rule 701. *Cf.*, *e.g.*, *Gadson*, 763 F.3d at 1210 (holding that where an agent does not draw "on personal knowledge regarding the investigation" but simply "'spoon-[feeds] his interpretations of the phone calls and the government's theory of the case to the jury,'" the agent's opinions are neither based on "his own concrete perceptions" nor "helpful to the jury" (citation omitted)). But substantially for the same reason that such testimony arguably might not meet Rule 701's "helpful" requirement—*i.e.*, that the jury is capable of construing one letter in light of the other—any error here would not be prejudicial. That is especially true considering the substantial additional admissible evidence

---

[4] We reject Defendants' contention that the lack of details in the foundation provided for some of Feeney's opinions made them "impervious to testing through cross-examination." On the contrary, that lack of detail itself provided fodder for cross-examination that could undermine Feeney's persuasiveness and credibility. As the district court stated in rejecting this same contention, "the interesting irony here is the more foundation is provided for these opinions, the stronger the opinion and the more credible the witness is." In any event, even if the district court erred, we would hold that the error was not prejudicial. As set forth above, the context supplied by other witnesses, as well as the entire course of the communications themselves, amply confirm their import.

concerning the attack on Vigil, including the coded communications themselves, Feeney's permissible testimony concerning specific coded phrases, and Ocampo's and Ochoa-Gonzalez's testimony that Andrew stated he had ordered a hit on Vigil.

**3**

Defendants also challenge Feeney's opinion testimony as to the meaning of a variety of terms related to drug trafficking by NF members. We reject these contentions as well.

Feeney testified that references in various conversations to "stuff for the restaurant" or "stuff" for "school" were references to drug trafficking. Feeney stated that his understanding of the meaning of these coded terms was based on his perception of how those terms were used by NF members during calls that he listened to, but he again did not provide further details concerning those calls. Although the foundation laid for this testimony was thin, we hold that there was no prejudicial abuse of discretion in the admission of this testimony for largely the same reasons discussed above in section I(B)(2). Moreover, Ochoa-Gonzalez and Fernando Rangel, another cooperating former Norteño who testified at trial, independently testified to the meaning of many of these same coded terms as used by NF members.

Feeney also testified as to the meaning of certain other phrases used in discussions that assertedly addressed drug trafficking. For example, he testified

that references to "white" items (such as "white t-shirts") meant cocaine, green items meant "marijuana," and "black" items meant heroin. Feeney further addressed the meaning of various references to other persons involved in the drug trafficking activities, stating that the phrases "Mormons" and "Jazz" referred to NF members in Utah, and that "*tierra de manzanas*"—Spanish for "land of apples"—referred to NF members in Washington State. The foundation for these opinions was again fairly scant, and the relatively unimaginative nature of some of these coded terms arguably raises an issue about whether this testimony was helpful to the jury. But once again we cannot say that the district court abused its discretion, much less that Defendants were prejudiced. Feeney's testimony on these points reinforced what were already, in the context of the trial record as a whole, fairly obvious conclusions about the meaning of certain communications.

## C

Defendants also contend that, because some of Feeney's opinions about the meaning of coded terms were based on his matching up of conversations with information from inmate financial records and other BOP records, his testimony violated the Confrontation Clause by necessarily introducing, as testimonial hearsay, the substance of "testimonial investigative reports" prepared by other BOP investigators. Reviewing de novo, *see United States v. Brooks*, 772 F.3d 1161, 1167 (9th Cir. 2014), we hold that there was no prejudicial error.

12

Defendants' argument rests on the premise that Feeney did not conduct a *personal* review of underlying BOP business records that are covered by a hearsay exception, but instead "apparently" relied upon "investigative reports—testimonial hearsay—provided to him by other BOP personnel, that he requested be compiled concerning certain inmates." Defendants, however, do not point to anything in the record that supports this assertion. Indeed, they acknowledge in a footnote that Feeney testified that he reviewed "financial records" and, in the cited testimony, Feeney explained that he had reviewed financial records that were kept "in the ordinary course of business" by persons with "personal knowledge of the facts of the transactions" recorded. Defendants have not established that the district court erroneously permitted Feeney to testify about the substance of "investigative reports" or the "collective knowledge of unnamed persons."[5]

This conclusion is confirmed by considering the specific examples of alleged Confrontation Clause violations that Defendants provide. First, Defendants cite Feeney's testimony opining that the phrase "three amigos" in a letter sent to inmate Ernest Killinger at USP McCreary was a reference to NF leaders Cornelio

---

[5] Defendants also assert that, because Feeney's years of reviewing NF communications rested in part on materials selectively sent to him by other BOP investigators, his knowledge necessarily drew upon their representations concerning the communications they were sending him. But to establish a Confrontation Clause violation, Defendants would have to identify a specific instance in the record in which a testimonial assertion of such an investigator was actually relayed by Feeney to the jury. They have failed to do so.

("Cornie") Tristan, Joseph ("Pinky") Hernandez, and James ("Tibbs") Morado. Defendants highlight that, in explaining the basis for his opinion, Feeney testified that, after hearing a conversation in which Villanueva said that money would be sent to the "amigos" in Colorado, Feeney observed the money arrive in those three persons' accounts. Defendants assert that, because Feeney did not work at that prison in Colorado, he must have relied on "investigative reports" rather than on a review of the underlying business records themselves. The record does not support this speculation. On the contrary, Feeney testified that, after Villanueva's statement, Feeney saw "the actual money orders being deposited on those inmates in Colorado," namely "Pinky, Cornie, and Tibs [*sic*]" and that he "watch[ed] the money being placed on the accounts."

Second, Defendants contend that Feeney necessarily relied on "testimonial reports from other investigators" when he "offered his lay opinion that 'Demonito' was Tobias Vigil and 'Polvo' was Earnest [*sic*] Killinger." This contention fails, because its premise is demonstrably incorrect. As noted earlier, the district court never permitted Feeney to offer an opinion as to the identities of "Demonito" and "Polvo"; those identifications were made by cooperating gang members. *See supra* at 7–8.

Third, Defendants argue that "Feeney relayed inadmissible hearsay when he relied on materials seized during [prison] cell searches without indicating whether

14

he was present during the search."  Specifically, Defendants argue that Feeney relied on "material removed from" Vilches's prison cell by other prison officials when he identified the handwriting of Vilches in a letter relayed to Andrew by Jessica Beluneva.  This argument fails, because the district court *sustained* Defendants' objection when Feeney stated that his identification of the handwriting in this letter was based in part on "material removed from the cell."  The district court then immediately dismissed the jury and required the Government to make a proffer to support Feeney's opinion, and the Government explained that Feeney would rely on (1) a comparison between the handwriting in the subject letter and that in *another* letter relayed from the address of Vilches's sister; and (2) contextual clues within the subject letter itself.  It was on that basis that the district court allowed Feeney to proceed to identify the handwriting in the subject letter.  Notably, Defendants did *not* object to Feeney's identification of Vilches's handwriting in the comparator letter, and his ensuing testimony that the handwriting in the subject letter was the same does not implicate the Confrontation Clause.

Defendants have thus failed to show any violation of the Confrontation Clause in Feeney's testimony.

## II

We next reject Defendants' challenge to the jury instructions concerning the elements of a conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d). Defendants concede that our review is only for plain error, and we hold that there was no such error.

Defendants contend that the RICO conspiracy instructions failed to inform the jury that, in order to convict a given Defendant of conspiring to violate RICO's prohibition on conducting an enterprise's affairs through a pattern of racketeering activity, *see* 18 U.S.C. § 1962(c), the jury had to find that he "'knowingly agree[d] to *facilitate* a scheme which includes the operation or management of a RICO enterprise.'" *United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004) (emphasis added) (citation omitted), *modified on other grounds*, 425 F.3d 1248 (9th Cir. 2005). This requirement was omitted, according to Defendants, because in describing the elements of RICO conspiracy, the instructions stated that the Government must show that the Defendant "knowingly agreed that either the defendant *or another person* would be associated with the enterprise" and that he "knowingly agreed that either he *or another person* would conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity." While we agree that this aspect of the instruction's wording was less than ideal, Defendants overlook the fact that the

16

above-quoted description of the elements of RICO conspiracy was followed by additional relevant instructions and that, taken "'as a whole in the context of the entire trial,'" the district court's instructions were sufficient "'to guide the jury's deliberation.'" *United States v. Moore*, 109 F.3d 1456, 1465 (9th Cir. 1997) (en banc) (citation omitted).

Specifically, the instructions also stated that, "[i]n order for you to convict a defendant of racketeering *or RICO conspiracy*, the Government must prove beyond a reasonable doubt that the defendant agreed to *participate in the enterprise* with the knowledge and intent that at least one member of the racketeering conspiracy" would commit the requisite predicate acts of racketeering. The instructions further stated that, "[i]n order to find a defendant guilty of racketeering conspiracy, the Government must prove beyond a reasonable doubt that the defendant joined the conspiracy charged in the indictment knowing the conspiracy's purpose and *intending to facilitate it*. The defendant must know the essential nature and scope of the enterprise." Viewed as a whole, these instructions sufficiently required the jury to find that a defendant agreed to facilitate and participate in a scheme that included the operation of a RICO enterprise. *See Fernandez*, 388 F.3d at 1229–30 (conviction of RICO conspiracy requires a finding that the defendant "agreed to facilitate" such a scheme, but does not require a finding that the defendant personally committed either an overt act or

the predicate acts of racketeering).  There was no plain error.

### III

Jaime and Henry appeal the district court's denial of their motion under Federal Rule of Criminal Procedure 29(c) for a judgment of acquittal on Count 7 (obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2)) and Count 9 (conspiracy to obstruct justice, in violation of 18 U.S.C. § 371).  These counts were based on the theory that Jaime, at Henry's direction, destroyed evidence of Henry's commission of a double murder by setting fire to the apartment containing the deceased victims' bodies.  Reviewing de novo, *see United States v. Green*, 592 F.3d 1057, 1065 (9th Cir. 2010), we hold that there was no error.

Neither side challenges the district court's jury instructions, which required the Government to prove, *inter alia*, that "the defendant had knowledge that his actions were likely to affect [an] official proceeding," and which defined an "official proceeding" as "a proceeding before a court, judge, or federal agency." The instructions further provided that "[t]he proceeding may be civil or criminal" and that "a federal grand jury proceeding is an official proceeding."  However, "a *criminal investigation* is not an 'official proceeding' under the obstruction of justice statute." *United States v. Ermoian*, 752 F.3d 1165, 1172 (9th Cir. 2013) (emphasis added).  Although the statute confirms that "an official proceeding need not be pending or about to be instituted at the time of the offense," 18 U.S.C.

18

§ 1512(f)(1), the Government agrees that, to show the requisite nexus, it had to establish that an official proceeding was at least foreseeable at the time the obstructive actions occurred. The statute states, however, that there is no requirement to show that the defendant knew that the foreseeable official proceeding would be a *federal* proceeding. *Id*. § 1512(g)(1).

Henry and Jaime do not contest that they knew the double murder would draw the attention of law enforcement authorities, but they assert that there was inadequate proof that they knew it would result in an "official proceeding" within the meaning of the statute. In addressing that issue, the parties dispute whether the convictions may be upheld on the theory that Jaime and Henry acted to obstruct a possible *criminal prosecution* as opposed to a *grand jury* proceeding. The Government argues that the law and the instructions allow either theory, but Henry and Jaime contend that the case was argued to the jury solely on the latter theory. We need not resolve this dispute, because we hold that, contrary to what Henry and Jaime contend, the evidence was sufficient to permit a rational jury to conclude that each of them "reasonably foresaw a grand jury proceeding would be empaneled."

Henry and Jaime argue that, because California (unlike the federal system) rarely uses grand juries, there is no basis to conclude that, by covering up the double murder, they knew that a *grand jury* proceeding was foreseeable and would

19

be obstructed. But Henry was no stranger to the federal criminal justice system, because he had previously been prosecuted and convicted in federal court—indeed, he was on federal supervised release at the time of the murders. Henry also knew that he had already drawn the attention of federal authorities and that they had installed a "pole camera" outside his apartment complex. *See United States v. Binday*, 804 F.3d 558, 590–91 (2d Cir. 2015) (nexus element met where defendant was aware that he was the target of a federal investigation). Although Jaime had no prior federal conviction, he lived in the same apartment complex with Henry and Rangel, who was also on federal supervised release, and a search of his apartment revealed a shoebox of NF-related materials that included discussion of federal indictments, including Henry's, as well as a press account of Henry's prior federal criminal case. Although Henry and Jaime emphasize that there is no evidence specifically showing that they were aware that federal indictments are the result of *grand jury* proceedings, the jury could permissibly draw the inference that members of a sophisticated prison gang with knowledge of, or personal experience in, the federal criminal justice system would be aware of the use of grand juries.[6]

---

[6] Because the evidence was sufficient on Counts 7 and 9, Henry's and Jaime's piggybacked challenge to the sufficiency of the evidence on Count 10 (use of fire to commit a felony) necessarily also fails.

## IV

## A

Larez challenges the sufficiency of the evidence underlying his conviction for conspiring to commit murder to maintain and increase his standing in a racketeering enterprise, in violation of 18 U.S.C. § 1959(a)(5) (Count 2).[7] Because Larez did not move for an acquittal below, we review only for plain error. *United States v. Cruz*, 554 F.3d 840, 844–45 (9th Cir. 2009). We hold there was none.

Larez contends that his conviction on this charge could only have rested on the alleged conspiracy to kill Sade Douglas, who had witnessed Henry's double murder, but he argues that there was insufficient evidence that that particular conspiracy was "for the purpose of . . . maintaining or increasing position" in NF. 18 U.S.C. § 1959(a). The Government disputes whether this count necessarily rested on the Douglas conspiracy. But even assuming that the count relied on Larez's conduct in connection with the Douglas plot, we conclude that there is sufficient evidence that Larez's participation in the conspiracy to kill Douglas was for the purpose of maintaining his position in NF.

Rangel testified that he relayed an order from Henry to Larez to have Douglas killed, and Larez then enlisted Shane Bowman to try to find Douglas and

---

[7] Because § 1959's title is "Violent crimes in aid of racketeering activity," that section is sometimes referred to as the "VICAR statute."

kill her.  Together with Rangel and Jaime, Bowman then unsuccessfully sought to locate Douglas.  Bowman testified that he carried out this order to look for Douglas because of his obligations as a Norteño.  Even assuming that Henry's underlying double murder was not in aid of racketeering activity, Larez's subsequent conspiracy to kill Douglas (a witness to those murders) was carried out through the NF's hierarchy, and a jury could reasonably conclude that, in doing so, Larez enhanced and solidified his position within NF.  *See United States v. Banks*, 514 F.3d 959, 970 (9th Cir. 2008) (holding that the "purpose element of the VICAR statute" is satisfied where the defendant's motivation was, in part, to enhance his position "in the eyes of 'individuals or factions within the enterprise'" (citation omitted)).

## B

The Government concedes that the district court plainly erred by entering judgments of conviction against Larez on both Count 19 (using a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)) and Count 20 (using a firearm in furtherance of a crime of violence resulting in death, in violation of 18 U.S.C. § 924(j)).  Because § 924(c) is a lesser-included offense of § 924(j), and because both counts here were based on the same underlying murder of Martin Chacon, convictions and sentences on both counts violate "the aspect of the Double Jeopardy Clause that protects against multiple punishments."  *United*

22

*States v. Kuzma*, 967 F.3d 959, 977 (9th Cir. 2020). We therefore remand with instructions to vacate Larez's conviction and sentence on either Count 19 or Count 20. *See id*. ("Given that the ultimate 'sentencing responsibility resides' with the district court, the 'only remedy consistent with congressional intent' is for that court 'to exercise its discretion to vacate one of the underlying convictions.'" (citation omitted)).

## V

## A

Reviewing de novo, *see United States v. Bhagat*, 436 F.3d 1140, 1145 (9th Cir. 2006), we reject Andrew's contentions that the indictment failed to provide him with adequate notice or that there was a material variance from the indictment.

The indictment adequately alleged the elements of a RICO conspiracy, as well as the special sentencing factor that Andrew had conspired to commit murder. *See United States v. Musacchio*, 968 F.2d 782, 787 (9th Cir. 1991) ("[A]n indictment that sets forth the charged offense in the words of the statute itself is generally sufficient."). There was no prejudicial variance, because the attempted murder of Vigil—which was the factual predicate on which the Government relied at trial—did not depart in any material respect from the allegations of the indictment. *United States v. Doss*, 630 F.3d 1181, 1191 (9th Cir. 2011). Moreover, Andrew concedes in his brief that he was informed only one month

after being indicted that the Government "would attempt to prove he was responsible for an attack on [an] inmate named Tobias Vigil that had occurred in 2013 at McCreary federal prison in Kentucky."

Andrew's real complaint is that, due to deficiencies in fulfilling its discovery obligations, the Government did not clearly identify its precise theory as to how Andrew had allegedly ordered the attack on Vigil and the role that Killinger played in that attack. The district court recognized that the Government's discovery on this subject had been unjustifiably delayed and piecemeal, and it agreed with Andrew that "an appropriate remedial measure is warranted." We hold that there was no abuse of discretion in the district court's choice of remedies. *United States v. Schwartz*, 857 F.2d 655, 657–58 (9th Cir. 1988). The district court barred the Government from adding additional witnesses concerning the Vigil attack to its witness list, precluded the Government from mentioning the Vigil attack in its opening statement (so that Andrew would not need to do so in his opening statement), and ordered that Vigil and Killinger would be brought to the Northern District of California "to facilitate an interview" by Andrew's counsel (an offer that counsel declined). Although Andrew contends that these measures were inadequate, he has not provided any basis other than speculation for concluding that the district court's remedy was prejudicially inadequate.

**B**

In convicting Andrew on the RICO conspiracy count, the jury also made a special finding that he had engaged in a conspiracy to commit murder. Andrew contends that this special finding must be vacated because the district court did not specifically instruct the jury that, in order to make this finding, the jury had to find all of the elements of a murder conspiracy under California law. We reject this argument.

In defining the violations that qualified as predicate acts for purposes of the RICO conspiracy charge, the district court correctly instructed the jury as to all of the elements of conspiracy to commit murder under California law. Andrew notes that the district court's jury instructions did not specifically state that the same elements applied in determining whether, as a special sentencing factor, Andrew was guilty of a California murder conspiracy. But the instructions must be viewed in the context of the verdict form that instructed the jury what was required to make that special finding, *see United States v. Singh*, 532 F.3d 1053, 1062–63 (9th Cir. 2008), and the verdict form plainly stated that, in order to find this factor, the jury had to determine whether Andrew conspired to commit murder "in violation of California law *as instructed earlier by the court*." In making that finding, the jury therefore necessarily had to apply the same elements of California law that were correctly stated in the instructions. There was no error.

Andrew also claims that the Government misstated the law during its rebuttal argument by stating that the requirement of an overt act in California could be satisfied by sending mail *into* California. The district court overruled Andrew's objection to this statement and denied his motion for a new trial on this ground. We conclude that there was no error. "It is not necessary that a defendant be physically within a jurisdiction to do a criminal act there," *Smith v. United States*, 92 F.2d 460, 461 (9th Cir. 1937), and the sending of a communication into California constitutes an overt act in California, *see id.* ("In this case an overt act was committed in California by petitioner telephoning there *from Honolulu*." (emphasis added)). *See also id.* (observing that, in *Hyde v. United States*, 225 U.S. 347, 360 (1912), "the defendant was held indictable for conspiracy in the District of Columbia on the strength of his conspiring in California to commit a crime and by way of [an] overt act, mailing a letter from California *to the District of Columbia*" (emphasis added)).

## C

As discussed earlier, cooperating Norteño Ochoa-Gonzalez testified at trial that Andrew admitted to ordering the "hit" on Vigil. *See supra* at 8. Andrew had sought to suppress this testimony on the ground that it was allegedly obtained in violation of his Sixth Amendment right to counsel under *Massiah v. United States*, 377 U.S. 201 (1964), but the district court denied the motion after an evidentiary

hearing. We review the district court's underlying factual determinations for clear error, *United States v. Harris*, 738 F.2d 1068, 1071 (9th Cir. 1984), but we review de novo its ultimate conclusion that there was no *Massiah* violation, *United States v. Danielson*, 325 F.3d 1054, 1066 (9th Cir. 2003).

Under *Massiah*, the Government violates a defendant's Sixth Amendment right to counsel when it "deliberately elicit[s]" an incriminating admission from a defendant "after he ha[s] been indicted and in the absence of counsel." 377 U.S. at 206. To establish a *Massiah* violation in the context of a statement made to a jailhouse informant, the defendant "must demonstrate both [1] that the informant was acting as a government agent and [2] that the informant deliberately elicited incriminating statements." *Fairbank v. Ayers*, 650 F.3d 1243, 1255 (9th Cir. 2011). The district court held that Andrew failed to establish the first of these two elements, and it therefore made no findings concerning the second. Based on the district court's findings, which are not clearly erroneous, we agree that Ochoa-Gonzalez was not acting as an agent of the Government when he had the jailhouse conversations with Andrew in which the incriminating statements were made.

**1**

The decision to place Ochoa-Gonzalez in the cell next to Andrew was made by Deputy Sean Sullivan of the Alameda County Sheriff's Office, which managed the facility at which both men were being held. The only relevant communication

27

between Sullivan and any federal official was Sullivan's telephone call to FBI Special Agent Dale Dutton, who had been a case agent on Ochoa-Gonzalez's previous drug-trafficking prosecution, and who had been involved in the U.S. Attorney's Office's decision to move Ochoa-Gonzalez from a federal prison in Arkansas to the Northern District of California. At the time, Dutton "was not involved in the investigation of the instant case," and Ochoa-Gonzalez's transfer was arranged in the hope of conducting a proffer session, after Ochoa-Gonzalez met with his California counsel, concerning "prior criminal activity related to Norteños in the North Bay, including unsolved homicides, drug trafficking, and other crimes related to Norteños." After Ochoa-Gonzalez arrived in California, he told Sullivan that he was a "dropout" from the Norteños, and he asked to be placed in protective custody. In order to evaluate the risks associated with any particular placement of Ochoa-Gonzalez, Sullivan needed to know whether he had in fact dropped out and whether he was cooperating with federal authorities; he therefore called Dutton.

The district court found that "Special Agent Dutton's response to Deputy Sullivan's phone call was to say that [Ochoa-Gonzalez] already had dropped out of the Norteño gang and 'that he should probably be housed appropriately based on that dropout status.'" Dutton "advised Deputy Sullivan that . . . it potentially could be a safety issue if [Ochoa-Gonzalez] was housed with active [gang members].'"

28

At the time that he called Dutton, Sullivan knew that Ochoa-Gonzalez had expressed an interest in being placed in a cell next to Andrew in order "to get information from him." As the district court stated, the testimony as to what, if anything, Sullivan told Dutton on this point was not entirely consistent. The district court assumed for purposes of its ruling that Sullivan did mention Ochoa-Gonzalez's desire to be placed next to Andrew, but the district court found that, "at most, Deputy Sullivan's reference to [Andrew] Cervantes was no more than passing." The district court also emphasized that Sullivan testified that his conversation with Dutton "did not affect his own decision" to house Ochoa-Cervantes next to Andrew. Sullivan acknowledged that Ochoa-Gonzalez's desire to be housed next to Andrew was a consideration in his ultimate placement decision.

**2**

Given the district court's finding that Sullivan made the decision on his own to house Ochoa-Gonzalez next to Andrew, the district court correctly concluded that Sullivan's actions in doing so are insufficient to make Ochoa-Gonzalez an agent of the Government for *Massiah* purposes. Although Sullivan had mentioned to Dutton that Ochoa-Gonzalez wanted to be placed next to Andrew, the district court found that, "at most," the comment was "no more than passing." Dutton did not reference Andrew in his response to Sullivan, which instead focused on the

"safety issue" presented by Ochoa-Gonzalez's "dropout status." The district court also credited Sullivan's testimony that Dutton's comments did not affect his decision to house Ochoa-Gonzalez next to Andrew. Under these circumstances, Sullivan's independent placement decision did not make Ochoa-Gonzalez an agent of the Government.

Of course, the fact that Sullivan was in a position to make that decision was only the result of the Government's actions in bringing Ochoa-Gonzalez into the Northern District of California. But the district court correctly concluded that the Government's transfer of Ochoa-Gonzalez was "too attenuated" from Sullivan's placement decision or Ochoa-Gonzalez's subsequent actions to establish that the latter was acting as the Government's agent for purposes of *Massiah*. Ochoa-Gonzalez had made clear that he wanted to meet with his counsel before any proffer session, and one purpose of moving him into the district was to enable him to meet with his lawyer concerning any potential cooperation. At the time of Ochoa-Gonzalez's arrival in California, he had not yet met with his attorney and no decision had been made by either him or the Government on a proffer session, much less cooperation. Moreover, the district court found that the transfer was made for the purpose of potentially obtaining information in connection with "unsolved crimes involving Norteños in the North Bay" and *not* for purposes of the then-pending drug charges against Andrew. Further, Ochoa-Gonzalez did not meet

30

with anyone from the FBI or the U.S. Attorney's office until after his jailhouse conversations with Andrew. Under these circumstances, the district court correctly held that Ochoa-Gonzalez was not acting as a Government agent when he had those conversations. *Cf. Randolph v. California*, 380 F.3d 1133, 1147 (9th Cir. 2004) (returning cooperating informant to jail cell *after* he met with prosecution team and relayed incriminating statements from his counseled cellmate could be sufficient to render informant a government agent for purposes of *Massiah*).[8]

Accordingly, we affirm the district court's denial of Andrew's suppression motion.

## VI

### A

Reviewing de novo, *see United States v. Rosas*, 615 F.3d 1058, 1063 (9th Cir. 2010), we hold that the district court's use of the first-degree murder sentencing guideline in calculating the base offense level for Henry's RICO conspiracy conviction did not offend the Sixth Amendment.

The jury did not reach a verdict on the two separate counts charging Henry with murder in violation of the VICAR statute. Although the jury convicted Henry of the main RICO conspiracy charge, its special verdict on that count also stated

---

[8] In contrast to *Randolph*, when the Government here held its first proffer session with Ochoa-Gonzalez and learned that he wanted to be housed near Norteños in order to get information, he was moved to a different jail the very next day.

that the jury had *not* unanimously found that Henry "conspired to commit the murder of actual and suspected members of rival gangs, individuals suspected of cooperating with law enforcement, and individuals who defied the will of *Nuestra Familia*." As noted earlier, the jury also convicted Henry of the three obstruction-related counts (Counts 7, 9, and 10). *See supra* at 18–20. It also convicted Henry on the drug-trafficking conspiracy charge, although it was unable to reach a verdict as to Henry with respect to the amount of methamphetamine involved.

Even assuming that the special verdict means that the jury acquitted Henry of conspiracy to commit murder as a predicate act in the overall RICO conspiracy charge on which he was convicted, the Sixth Amendment did not preclude the district court from considering Henry's double murder in sentencing him for the RICO conspiracy. We have squarely held that, in sentencing a defendant on a RICO conspiracy charge, a district court does not violate the Sixth Amendment by considering relevant conduct associated with other counts on which the defendant was acquitted (such as VICAR acts of violence and conspiracy to commit murder). *United States v. Mercado*, 474 F.3d 654, 656–58 (9th Cir. 2007).

Henry asserts that this case falls within a different line of authority holding that a sentencing court may not contradict an express finding made in the jury's special verdict. *See United States v. Pimentel-Lopez*, 859 F.3d 1134, 1140–43 (9th Cir. 2016); *cf. Mitchell v. Prunty*, 107 F.3d 1337, 1339 n.2 (9th Cir. 1997) (jury

special findings "are dispositive of the questions put to the jury"), *overruled on other grounds by Santamaria v. Horsley*, 133 F.3d 1242 (9th Cir. 1998) (en banc). But Henry overstates both the holding of these cases and the import of the special verdict here.

*Pimentel-Lopez* made clear that its distinct rule applies only when the jury's special verdict "made an *affirmative* finding" that a particular fact is true, and not when the jury simply "*failed* to find a fact under the exacting standard applicable to criminal cases." 859 F.3d at 1140 (emphasis added). *Pimentel-Lopez* confirmed that, in the latter situation, the district court at sentencing "is free to find the same fact under a less stringent standard of proof." *Id*. Here, the jury's special verdict merely states that the jury did *not* "unanimously find"—*i.e.*. that it had failed to find—that Henry conspired to commit murder of the categories of persons specified. Accordingly, under *Pimentel-Lopez*, this case is governed by the general rule that, when the jury fails to make a finding beyond a reasonable doubt, the district court may proceed to find the fact in question under the lower standard of proof applicable at sentencing.[9]

---

[9] Moreover, Henry overlooks the fact that the special verdict only addressed whether Henry had "conspired" to commit murder, not whether he had *committed* murder. The portions of the verdict that addressed the latter question were the VICAR murder charges (Counts 5 and 6), and the jury did *not* acquit on those charges but instead was unable to reach a verdict. Thus, strictly speaking, this case is neither an acquitted-conduct case nor an affirmative-special-verdict

**B**

We hold that there was no error in the district court's calculation of the applicable sentencing guideline range with respect to Henry.

Under United States Sentencing Guidelines ("U.S.S.G.") § 2E1.1, the base offense level for a RICO conspiracy is the higher of 19 or "the offense level applicable to the underlying racketeering activity." The district court concluded that Henry's double murder constituted "underlying racketeering activity" and, as we have explained, nothing in the jury's verdict precluded it from making that determination. Because the district court further concluded that Henry's killings constituted first-degree murder, the district court properly applied U.S.S.G. § 2A1.1, which supplies the base offense level for such conduct. The district court thus correctly concluded that the base offense level on the RICO conspiracy charge was 43.

Henry nonetheless contends that, in determining whether he had committed first-degree murder, the district court should have applied a clear-and-convincing-evidence standard rather than a preponderance-of-the-evidence standard. Henry concedes that, because this argument was not raised in the district court, our review

_____

case. Rather, it is a case in which the sentencing judge properly considered conduct underlying other charges on which the jury failed to reach a verdict and made no special findings. On appeal, Henry does not contend that sentencing courts are barred from considering counts on which there was a hung jury, and we deem any such argument to be forfeited.

34

is only for plain error. *Cruz*, 554 F.3d at 845. We hold that there was no such error. Even if we were to conclude that the district court should have applied a higher standard of proof, any error neither affected Henry's "substantial rights" nor "'seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings.'" *Id*. (citation omitted).

The district court's remarks at sentencing leave no doubt that it would have made the same finding under a higher standard. The district court stated that it found Douglas's eyewitness testimony to be "quite convincing[]" and that "there's not any doubt in my mind that [Henry] committed those acts." *Cf. United States v. Technic Servs., Inc.*, 314 F.3d 1031, 1047 (9th Cir. 2002) (holding that the district court's comment that "it had 'no doubt'" about sentencing enhancements confirmed that clear-and-convincing-evidence standard was met), *overruled on other grounds by United States v. Contreras*, 593 F.3d 1135, 1136 (9th Cir. 2010) (en banc). The district court also specifically commented on Henry's evidence of diminished capacity and stated that it found that evidence "unconvincing." The district court also referred to the sheer length of time involved in the actual killings themselves, which involved multiple stabbings:

> [W]e don't have the number of stab wounds for one of the victims, but with one we have them. Over 35.
>
> And I sat there trying to understand how someone could be on top of someone else and stab one, two, three, four, five, six,

35

seven, eight, and we're not even to 15. Time and time and time and time again. It is brutal conduct.

The district court also stated that, if it were to ignore the murders in determining the sentence, that would result in an "incomprehensible" view of Henry's conduct.

Moreover, given what we consider to be the overwhelming evidence of Henry's premeditation and malice, we hold that there is no basis to find a plain error requiring resentencing. *See United States v. Garro*, 517 F.3d 1163, 1169 (9th Cir. 2008) (holding that, in light of the evidence at trial, there was no plain error in applying the preponderance standard at sentencing). Henry did not commit the murders immediately upon seeing his sister fall out a window (which he blamed on the victims), but only hours later after he had repeatedly questioned the victims about what had happened and after he had had time to think about how he would respond. *See People v. Wells*, 245 Cal. Rptr. 90, 92 (Cal. Ct. App. 1988) (holding that planning need only begin "moments before" a killing to constitute first-degree murder). When Henry's knife broke during the killings, Henry ordered Douglas to fetch him a second knife, at which point he continued deliberately stabbing both of his victims. There was no plain error in the district court's use of the preponderance standard at Henry's sentencing.[10]

---

[10] For the same reasons, we reject Henry's contention that the evidence of first-degree murder was inadequate under any standard.

In connection with a home invasion robbery in Livermore, California, Jaime was convicted of two separate counts of VICAR assault with a dangerous weapon, in violation of 18 U.S.C. § 1959(a)(3) (Counts 11 and 12); one count of Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count 14); and one count of Hobbs Act conspiracy, in violation of 18 U.S.C. § 1951(a) (Count 13). Jaime was also convicted of using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c), and the jury found that the firearm was used, carried, and brandished during and in relation to the four predicate crimes identified above.[11]

The Government concedes that, in calculating the guidelines offense level for the sentencing groups corresponding to Counts 11–14, the district court plainly erred in applying a firearms enhancement under U.S.S.G. § 2A2.2(b) to each of those groups. The application notes to U.S.S.G. § 2K2.4, which governs sentencing of § 924(c) offenses, state that if a sentence is imposed under § 924(c), then the court may not apply any "specific offense characteristic for possession,

---

[11] There is some question whether Hobbs Act conspiracy qualifies as a "crime of violence" for purposes of § 924(c), *see United States v. Dominguez*, 954 F.3d 1251, 1262 (9th Cir. 2020) (reserving this question), but we need not decide that issue here. Because the district court grouped the Hobbs Act conspiracy count with the Hobbs Act robbery count for sentencing purposes, the issue cannot affect the outcome. *See id*. at 1261 (holding that Hobbs Act robbery is a crime of violence).

brandishing, use, or discharge of an explosive or firearm when determining the sentence for the underlying offense." U.S.S.G. § 2K2.4, n.4; *see also United States v. Aquino*, 242 F.3d 859, 861 (9th Cir. 2001). The Government nonetheless contends that we should not remand for resentencing, because an entirely separate error it claims for the first time on appeal offsets this error. We decline to address this contention in the first instance, leaving it to the district court to consider if the Government renews the point at resentencing on remand.

Because the erroneous application of § 2A2.2(b) could affect how the various sentencing groups are then combined under U.S.S.G. § 3D1.4, we vacate Jaime's sentence in its entirety and remand for resentencing.[12]

## VIII

We **AFFIRM** the convictions and sentences of Henry Cervantes and Andrew Cervantes. We **AFFIRM** the convictions of Jaime Cervantes, but we **VACATE** his sentence and **REMAND** for resentencing. We **AFFIRM** the convictions and sentence of Alberto Larez, except that we **REMAND** with instructions for the district court to vacate his conviction and sentence on one, and only one, of either Count 19 or Count 20.

---

[12] Although we are remanding for resentencing on other grounds, we reject Jaime's contention that the district court should have granted a downward departure or variance based on his assertedly overstated criminal history, and we likewise reject his claim that his sentence was substantively unreasonable.